**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| CHILD TRENDS, INCORPORATED,<br>12300 Twinbrook Parkway, Suite 235<br>Rockville, Montgomery County, MD<br>20852,<br><br>    *Plaintiff*,<br><br>    v.<br><br>ROBERT F. KENNEDY, JR., in his official<br>capacity as Secretary of Health and Human<br>Services,<br>200 Independence Avenue, S.W.,<br>Washington, D.C. 20201,<br><br>ANDREW GRADISON, in his official<br>capacity as Acting Assistant Secretary at the<br>Administration for Children and Families,<br>330 C St, S.W.,<br>Washington, D.C. 20201,<br><br>    *Defendants*. | Case No. 25-cv-1479 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. Plaintiff Child Trends, Incorporated brings this action to prevent the imminent termination without due process of seven federal grants, totaling over $4 million, awarded to Child Trends by the Department of Health and Human Services (HHS).

2. Child Trends is a nonprofit organization based in Rockville, MD, and is dependent on federal funding through government grants and contracts. Child Trends has structured its entire business in reliance on the federal government abiding by the laws and regulations governing its grant awards.

3.      Unlike most grants through the federal government, HHS may not terminate Child Trends's grants based on new policy preferences or other policy reasons. The HHS regulations governing Child Trends's grants are clear that HHS may terminate such grants only (1) if the grantee "fails to comply with the terms and conditions of the award"; or (2) "for cause."

4.      However, a week ago, HHS mistakenly emailed to Child Trends and other grantees a spreadsheet showing that HHS is planning to terminate *en masse* more than 150 research grants previously awarded by HHS's Administration for Children and Families (ACF), including seven grants awarded to Child Trends.[1]

5.      Although HHS has provided Child Trends no indication that it is failing to comply with the terms and conditions of these grants, or has committed other misconduct that would constitute cause for termination, HHS appears set on terminating these grants imminently, without any pre-deprivation due process, in the hope that once the grants are terminated, grantees such as Child Trends will be left without an effective legal remedy to challenge the terminations in court.

6.      The Due Process Clause does not permit this unlawful gambit. It is a bedrock principle of constitutional law that the government cannot deprive individuals or organizations of their property interests without due process. Child Trends has a property interest in obligated grant funds it has been awarded, and yet the government does not plan on providing it *any* process before terminating millions of dollars in grant awards to Child Trends, on the basis that for some previously unknown reason Child Trends has engaged in conduct justifying a for-cause termination.

---

[1] Ryan J. Foley, *Email Mistake Reveals Secret Plans to End Research on Head Start and Other Safety Net Programs*, May 2, 2025, https://apnews.com/article/children-head-start-research -cuts-trump-hhs-ecfa2b140990057eb412e476dc875ffa.

7.      Because the imminent, unlawful termination of these grants would irreparably injure Child Trends and its 250 employees, and the risk of erroneous termination of these grants without due process is so high, Plaintiff seeks a temporary restraining order preventing the government from terminating the grants without providing Child Trends fair notice and a meaningful opportunity to be heard.

## PARTIES

8.      Plaintiff Child Trends, Incorporated (Child Trends) is a nonprofit research organization founded in 1979 that maintains its principal place of business in Rockville, Maryland. Child Trends focuses on improving the lives of children, youth, and families. Since 2022, Child Trends has received a number of grants from HHS's Administration for Children and Families. For example, in September 2023, Child Trends was awarded a $1,550,000 grant to develop a research center on the strengths and needs of Hispanic children and families with low incomes. The Center plays a critical role in helping program leaders, policymakers, and service providers ensure that Hispanic Americans have equal access to federal programs.

9.      Defendant Robert F. Kennedy, Jr. is Secretary of the United States Department of Health and Human Services and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. 42 U.S.C. § 300u. He is sued in his official capacity.

10.     Defendant Andrew Gradison is the Acting Assistant Secretary at the Administration for Children and Families at HHS. He is sued in his official capacity.

## JURISDICTION AND VENUE

11.     This court has subject-matter jurisdiction to adjudicate these claims because this action arises under the Constitution and laws of the United States, 28 U.S.C. § 1331; and because

Defendants are United States officials, 28 U.S.C. § 1346(a)(2).

12.    This court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-2202, and the court's inherent authority to enjoin federal officials from acting unlawfully.

13.    Venue is appropriate under 28 U.S.C. § 1391 in the District of Maryland because Plaintiff Child Trends maintains its principal place of business in Maryland and, as such, a substantial part of the events giving rise to this Complaint have taken place in Maryland.

## FACTUAL AND LEGAL BACKGROUND

### *Child Trends Structures Its Business in Reliance on the Government Acting Lawfully*

14.    Over four decades, Child Trends has worked to become a nationally recognized nonprofit research organization that provides trusted, reliable data and analysis on the well-being of children and families. It has accomplished this by partnering with federal, state, and local agencies to deliver evidence-based insights to policymakers at every level.

15.    Child Trends is a project-based organization. This means that it has no meaningful source of funding outside of its ongoing contracts and grants. Despite this, Child Trends has always maintained sufficient work and, until the last few months, has never had to layoff groups of program staff for lack of work.

16.    About 80% of Child Trends's funding comes from the U.S. government, primarily the U.S. Departments of Education and Health and Human Services. More than half of that work is in the form of grants and cooperative agreements.

17.    Child Trends's success in finding ongoing work has been attributable in part to its ability to plan for the future. It knows grant lifespans years in advance, and carefully manages development cycles to prevent gaps in project work. Even under sequestration, this careful

planning allowed Child Trends to maintain staff as current projects finished out their periods of performance and new projects from other funders ramped up.

18.    Child Trends has been able to hire staff, bid for projects, and invest in the long-term success of its business only because of the stability that federal grant programs provide. For example, Child Trends has been able to rely on the fact that, if the federal government enters into a cooperative agreement for a project period of several years, it will receive a steady stream of payments during that period, so long as Child Trends performs its obligations under the agreement.

***HHS Awards Millions in Grants to Child Trends***

19.    In recent years, Child Trends has received a number of grants from HHS funded under various statutory programs, including section 413 of the Social Security Act, the Child Care and Development Block Grant Act, and the Head Start Act.

20.    For example, in 2023, HHS's Administration for Children and Families (ACF) issued a funding opportunity announcement inviting applications for the establishment of a Center for Research on Hispanic Children and Families, to lead and support investigation of the needs of Hispanic populations served by ACF. The Center was tasked with investigating the best approaches to promote social and economic well-being among Hispanic children and families with low incomes.

21.    In September 2023, HHS awarded a grant to Child Trends to develop the Center and obligated $1,550,000 in federal funds for that purpose. *See* Ex. A. The period of performance for the award was September 30, 2023 to September 29, 2028.

22.    In connection with the grant award, Child Trends entered into a cooperative agreement with ACF's Office of Planning, Research and Evaluation (OPRE). Under the agreement, OPRE agreed to make grant awards to Child Trends in accordance with approved

annual applications and semi-annual reviews of performance progress and expenditures. *See id.* at 6.

23.     The purpose of the Center was to bring together a diverse, interdisciplinary team of academic, organizational, and community-based partners to conduct research that could inform policies concerning Hispanic families with low incomes. The Center was to focus broadly on child care and early education, Head Start, services to support self-sufficiency and economic mobility of families with low incomes.

24.     In July 2024, HHS obligated an additional $1,550,000 in federal funds through September 2025 for Child Trends to continue its work on the Center. *See* Ex. B.

25.     As another example, in August 2024, HHS awarded Child Trends a grant to develop and implement a Child Care Policy Research Partnerships project on advancing equitable access to high quality child care and early education for South Carolina families. *See* Ex. C. HHS obligated $400,000 to Child Trends through September 29, 2025, and the period of performance for the award was through September 29, 2029. In connection with the grant award, Child Trends again entered into a cooperative agreement with OPRE.

26.     Similarly, in September 2022, HHS awarded Child Trends a grant to research how the supply and demand for child care shifted in Maryland during the COVID-19 pandemic. *See* Ex. D. In connection with the grant, HHS has obligated $400,000 in federal grant funds each year since the grant was awarded, for a total of $1,200,000 in total federal funds approved. This funding was supposed to continue through September 2026.

27.     Other grant awards that Child Trends received are reflected in the table below:

| Project title | Award number | Amount of Federal Award | Period of performance |
|---|---|---|---|
| Effects of CCDF Payment Policies on Equitable Access to High-Quality Subsidized Care in Vermont | 90YE0297 | $400,000 | 09/30/2023 to 09/29/2027 |
| Migrant and Seasonal Head Start Families' Experiences of Support: The Role of Family Characteristics and Cultural-Familial Values | 90YR0187 | $100,000 | 09/30/2024 to 03/29/2026 |
| Mapping Affordability: Child Care Payments of Families Using Housing Vouchers | 90YE0325 | $99,945 | 09/30/2024 to 03/30/2026 |
| How Do Subsidy Policies Affect Child Care Access for Families of Children with Disabilities? | 90YE0322 | $100,000 | 09/30/2024 to 03/30/2026 |

*See* Exs. E-H.

28.     For each of these grants, Child Trends has not been informed by HHS of any failure to comply with the terms and conditions of the grant awards, and HHS has not informed Child Trends of any other possible basis for terminating the awards for cause.

**HHS May Only Terminate Grants Under Specific Conditions Not Met Here**

29.     The HHS grants at issue are governed by the HHS's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for HHS Awards that have been in effect since December 19, 2014. *See* 45 C.F.R. part 75. These regulations set forth in detail the circumstances under which a grant award may be terminated. *See* 45 C.F.R. § 75.372. Specifically, HHS may terminate an award without the grantee's consent only (1) if the grantee

"fails to comply with the terms and conditions of the award"; or (2) "for cause." 45 C.F.R. §
75.372(a).

30.    Notably, neither HHS nor ACF ever adopted the 2020 version of the Office of
Management and Budget's (OMB) Uniform Grants Guidance, which other agencies throughout
the government have recently been relying on to terminate grants. OMB's Uniform Grants
Guidance is a template of regulations that agencies may adopt to govern their administration of
grants. OMB's Guidance is not effective in its own right; it applies to an agency's grants only if
the agency adopts OMB's Guidance. 2 C.F.R. §§ 1.105(b)-(c). In 2020, OMB amended its
guidance to add a provision that would allow agencies to terminate grants where the grant no
longer effectuates "program goals or agency priorities." 85 Fed. Reg. 49506, 49559 (Aug. 13,
2020) (revising 2 C.F.R. § 200.340(a)(2)). While most agencies of the federal government
adopted this provision and the 2020 OMB guidance more generally, HHS and ACF never did.
*See* 45 C.F.R. § 75.110.[2]

31.    Thus, HHS's regulations do not permit HHS to terminate grants at will or simply
because a grant does not meet a new Administration's priorities.

***HHS Mistakenly Sends Spreadsheet Revealing Imminent Termination of Child Trends Grants***

32.    On April 30, 2025, an HHS contractor sent an email to Child Trends and other
grantees that mistakenly included information concerning its plans to terminate more than 150
research grants related to child and family well-being.[3]

---

[2] HHS has recently adopted a new version of OMB's Guidance issued in 2024, but that new
version revised the 2020 version's termination provision and does not go into effect until
October 1, 2025. 89 Fed. Reg. 80055 (Oct. 2, 2024).

[3] Associated Press, *List of Child Welfare Research Grants Marked for Termination in Mistaken
HHS Email*, May 2, 2025, https://apnews.com/article/hhs-research-grants-head-start-cuts-
d97f584304fa26fb6d4fe0651f8ba059.

33.     Although the email purported to be seeking updated contact information from grantees, the sender attached an excel spreadsheet to the email that included a column stating whether each grant would be "terminated" or "continued."[4]

34.     According to the spreadsheet, of the 177 listed grants, HHS intended to continue only 21 of them, or 12% of the total listed grants. OPRE was responsible for $154 million in grants and contracts in fiscal year 2024.

35.     The grants slate for termination included all seven of the Child Trends grants identified above.

36.     An HHS official later claimed that the spreadsheet represented only an "outdated" draft. On information and belief, however, the spreadsheet represents the true list of grants that HHS intends to terminate imminently.

***Child Trends Will be Irreparably Harmed by the Planned Grant Terminations***

37.     If HHS proceeds with unlawfully terminating the Child Trends grants, the organization will be imminently and irreparably harmed.

38.     As explained above, Child Trends is a project-based nonprofit and relies almost entirely on federal grants and contracts.

39.     As of January 2025, Child Trends had about two months of funds in reserves.

40.     Due to other recent grant terminations,[5] Child Trends has already had to undertake three rounds of layoffs. The first round required laying off 12 staff members, reducing working hours for 4 additional staff, and reducing salaries for all 11 members of its leadership

---

[4] Ryan J. Foley, *Email Mistake Reveals Secret Plans to End Research on Head Start and Other Safety Net Programs*, May 2, 2025, https://apnews.com/article/children-head-start-research-cuts-trump-hhs-ecfa2b140990057eb412e476dc875ffa.

[5] Child Trends is separately challenging actions by the Department of Education with respect to these other grant terminations. *See Child Trends v. Dep't of Educ.*, No. 8:25-cv-01154 (D. Md.).

team. The second round involved another layoff of 9 staff and required additional staff to reduce their time. A third round involved layoffs of two additional staff.

41.     If HHS proceeds with the seven grant terminations at issue here, Child Trends will need to immediately lay off at least another 20 staff members. The layoffs will include scholars with critical knowledge about childcare quality, supply, subsidies, access, and affordability work.

42.     Moreover, if the grant for the National Research Center on Hispanic Children and Families is terminated, the Center will not be able to continue, wasting years of effort and taxpayer dollars.

43.     Having to disclose that its grants were terminated will also likely make future awards more difficult to obtain. Child Trends risks losing trust with its state and local partners, who may now question the sustainability of its work. The organization also risks losing its reputation as a secure place for employees to build a long-term career.

44.     In short, there is a real risk that these imminent grant terminations, when combined with other recent cuts in federal funding, will pose an existential risk to Child Trends, a nonprofit that has served Maryland and the nation for over four decades.

## CLAIMS FOR RELIEF

### Violation of Procedural Due Process (Fifth Amendment)
### (Against all Defendants)

45.     Plaintiff hereby incorporates by reference the foregoing paragraphs of the Complaint as if set forth herein.

46.     Under the Fifth Amendment to the United States Constitution, the government may not deprive a person or entity of a protected property interest without due process of law.

47.     Plaintiff has a property interest in grant funds it has been awarded. Under federal

law, a grant or cooperative agreement creates "obligation of the United States Government," *see* 31 U.S.C. § 1501(a)(5), and an "obligation" represents "a legal liability" held by the Government "to disburse funds immediately or at a later date as a result of a series of actions." 50 C.F.R. § 80.91. Plaintiff has relied on these grants and the protection in HHS regulations that such grants could only be terminated for cause.

48.     Termination of Plaintiff's grants without pre-deprivation notice and a reasonable opportunity to be heard would violate the Due Process Clause, because the private interests at stake are enormous, the risk of erroneous deprivation is very high, and the burden on the government of providing pre-deprivation due process would be relatively low.

49.     Federal courts have the equitable power to enjoin unlawful actions by executive officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). This Court can and should exercise its equitable power to enter appropriate declaratory and injunctive relief.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff request that this Court:

A.     Declare that Defendants must provide Plaintiff with adequate pre-deprivation notice and a reasonable opportunity to be heard before terminating Plaintiff's seven grants identified above;

B.     Enjoin Defendants from terminating the grants until they provide Plaintiff with adequate pre-deprivation notice and a reasonable opportunity to be heard;

C.     Award Plaintiffs reasonable costs and attorneys' fees; and

D.     Award such other relief as this Court may deem just and proper.

May 7, 2025                          Respectfully submitted,

                                    */s/ John Robinson*
                                    Daniel F. Jacobson
                                    Lynn D. Eisenberg*
                                    John Robinson
                                    JACOBSON LAWYERS GROUP PLLC
                                    *1629 K Street NW, Suite 300*
                                    *Washington DC, 20006*
                                    *(301) 823-1148*
                                    *john@jacobsonlawyersgroup.com*

                                    * Of Counsel

                                    *Counsel for Plaintiffs*